We'll hear argument first this morning, Case 21-757, Amgen v. Sanofi. Mr. Lamkin? Thank you, Mr. Chief Justice, and may it please the Court. Amgen invented a new class of antibodies that lower cholesterol, that bind to a small spot on PCSK9, the sweet spot, and thereby block that protein from binding to and destroying LDL receptors that remove cholesterol. Amgen had in hand 384 examples before the Texas article Sanofi cites as hypothesizing such antibodies, before Sanofi began researching PCSK9. This case concerns the requirement that patents enable skilled artisans to make and use the invention. The roadmap in Amgen's patents allows skilled artisans to easily make those antibodies every time, using two new anchor antibodies that cover the entire sweet spot so skilled artisans can be certain to make all the claimed antibodies, including defendant's examples. The Federal Circuit here never identified a single actual antibody that's in the claims that can't be made or requires undue experimentation. Instead, it invoked something that no one will defend as even relevant here, the cumulative effort to make all or some large group of an invention's potentially myriad variations. This Court's cases, however, reflect the Act's pragmatic, boots-on-the-ground focus on enabling skilled artisans who want to practice the invention on a concrete action, making and using the invention. Patents thus satisfy the law when sufficiently definite to guide artisans' successful application of the invention. Then there's some practical way of putting them into operation, requiring reasonableness with due regard to the patent subject matter. In concrete terms, that means that those who are seeking to overturn the PTO's issuance of the patents and verdicts upholding them, here are two verdicts, have to do two things. One, at least have evidence of some variant of the invention, some category that require what this Court has called painstaking experimentation. And two, if they identify that, show why that matters to skilled artisans, because the statute is about skilled artisans seeking to make and use the invention. And reasonableness, not theoretical far corners never shown to affect the ability to do so. I, of course, welcome the Court's questions. Mr. Lampkin, would you take a minute and tell us exactly what the invention is? Yes, it's the class of antibodies that bind to a particular spot. Well, let's deal with that. You only have 26 that you have invented, right? No, that's not correct. The patent states that Amgen had 384. There are only 26 that are specified by amino acid structure, where you put out in the patent, as an example, here's the structure of the antibody. So does this process only produce 386? No, Your Honor. The testimony was that it will produce every antibody within the claims. And there's a reason for that. Our expert explained it. First, if you do the super-immunization protocol, you get a robust response across the spectrum. And in addition, if the mouse, this is a humanized transgenic mouse, if it has the DNA in it to produce that antibody, it will produce that antibody. And there was no evidence that there was some particular antibody that was harder to make, that for some reason you would expect it more difficult to come out of that. So, in other words, you can't say how many? No, Your Honor, I think we can say how many. And I think there's two things. First, the evidence shows in this art that about 400 you would get from coming out of the mouse. That's the number that we came up with, the number that Sanofi came up with, and anybody else came up with. And that's all that's known to date. And you wouldn't expect it to be a large number because it's a very tight, small, sweet spot. It's got unusual hills and valleys. It's 15 amino acids out of 700. So you wouldn't expect there to be a lot to do there. To get to a larger number, you'd have to engage in a process which is called conservative substitution, which means you take one of the ones you know already works, and you take one amino acid out or two amino acids out, and you swap in a very similar amino acid, one that behaves very similarly. But I think you're making the point, though, excuse me for interrupting you. I just want to end my consumption of the time. But in saying that, you don't know how many there are because the others are going to add, if that's a part of your process, whether it's conservative or random. No, Your Honor, I think that when you do the conservative substitution, antibody scientists aren't going to consider those near-identical twins to be distinct antibodies. They're 99.99% similar, and nobody is going to consider them distinct. But even if you were to say, well, gee, there's a large number out there, the difficulty of making any next antibody is straightforward. The record is clear, and the patents point out that this is sort of a routine process. It's very easy to go and say, I'm going to swap out this amino acid for another according to the table. It tells you which ones to do, and it's routine to test it. And so it only gets in the way of making any antibody you want. If you're saying, gee, what's the sort of effort to make them all? If it's so easy, why haven't you made all the 400? Pardon? Why haven't you made the 400, if it's that easy? So it's easy. And what happened, and why did it take you so long to do the post-filing discovery of more? So the reason we only specified the 26, and we came up with the 384, is a skilled artist in this area isn't looking for every possible antibody. They're just looking for ones that bind to the right place and therefore block. And so once you get those, your job is done. Could you tell me how your patent is different from finding antibodies? The process. What's unique about your process? Well, the patent isn't for process. It's for the class of antibodies. But it sounds to me like it's all about just process. Well, you're telling researchers, find all these antibodies, and you tell me that process is common. Everybody knows how to find those. And then what's your next step for the process? Well, Your Honor, when you're talking about the process or method, which is the enablement, how you get those, and it starts with something that didn't exist before, and that's these two anchor antibodies that cover the two parts of the sweet spot. And that allows you to find anything that's going to bind the sweet spot because they'll compete with that, and that's the first step. After that, it sets forth a super-immunization program. Except that you found in all of your disclosures only have three or four or five sweet spots, which you're claiming up to 26. And I don't think you've disclosed any binding that's up to 26. Right. I think if you're referring to the 16 amino acid residues. I'm sorry. I misspoke. And so that chart that I think that you're referring to has two key characteristics about it. The first is the evidence was that everything on that chart is enabled. The fact that the ones that we identified as the 26 examples in ours doesn't mean that it doesn't produce it. The experts explained exactly why you would get all of those, and there was simply no evidence of anybody immunizing mice and saying, there's something here missing. This doesn't work. I'm not getting everything I want. And so on this record and in this ARC, it's understood that all of those are enabled, all those can be made, and so the chart doesn't work against us in that way. And the nature of the chart itself actually explains why there's full enablement here. This is a chart of a bunch of antibodies that work. They bind to the sweet spot and they block. And none of them is identified to work better or different than the others. So to the skilled artisan, they're all the same. Just a few questions. I hope they're quick ones. Do you agree that a patent fails the enablement test if it would force a person who is skilled in the art to undertake undue experiment to produce the claimed invention? I think that's a fair statement of the law, painstaking experimentation to produce the invention. And by that I would mean the various categories or classes within that invention that would be important to a skilled artisan. I'll take that as a yes. Fair. Okay. Do you accept the WANS factors? Do you think they're useful? Do you think this court should endorse them? So the WANS factors can be useful in particular cases when properly applied. The problem with the WANS factors is they become something of a checklist that's abstracted and therefore replaces the ultimate statutory standard. The statute is about looking at a skilled artisan, a person there, the guy in the lab coat in his lab or a mechanic in his office, and it's about reasonably enabling them to make and use the invention. It's not about this checklist. And I'll give you one example of how it gets abstracted and doesn't work, and that's predictability. The Federal Circuit tends to say, gee, it's predictable or it's not predictable in the art just generally. But that's not the question we're talking about enablement. The question is, can the skilled artisan, using the patent and the tools available, reliably get to the invention? So sometimes is the answer for that one. Yeah, and I think the answer is they once probably were, but they kind of have outgrown their utility because they've become abstracted and tend to replace what really should ask every time. That first test that we talked about a moment ago. The WANS test. The WANS factors are useful to the extent they illuminate what we discussed as a standard, but not when they don't. I think that's right. And you need to ask each one with respect to the standard itself, not in the abstract. And do you agree that the broader the patent, the more difficult it is to prove enablement? Not necessarily, Your Honor. You could have a relatively broad patent, and you just need to have enablement commensurate with its scope. For example, if you have lots of categories within that patent, then you would have to enable what is important to the artisan within the category. As a general matter, would you agree that the broader the patent, the more you have to do to show what a skilled artisan would have to undertake to accomplish? You know, it's hard for me to agree with that in the abstract. I understand it would be hard for you to agree with it. No. But is it a fair statement of the law? It has to be commensurate with the scope, but harder and broader aren't necessarily synonymous. You can have something that's harder because it's narrower, because somebody leaves out a key thing to get that narrow part that's within the claim. So I think, yes, as a general matter, often if you have a broader claim, it may be harder, but it's hard to say that in every art for every circumstance that makes it more difficult. It's always with reasonableness, with due nature to the art. You've mentioned it, I think, a couple of times there, and you do on your reply brief on page 7, you said, when an invention has many embodiments, the patent enables the invention's full scope if skilled artisans can reasonably make and use variations. Can you flesh out reasonably a little bit for me? Yes. I think that it means that when you're looking at it, you're looking at what's important to the skilled artisan. If you can find just some oddity that can't be made, that doesn't invalidate the patent, because we're looking at what's important to skilled artisans. So, for example, if a patent, for example, taught you to make metal airplanes, you wouldn't invalidate it because somebody said, gee, you know what, it'd be really hard to make one out of lead. That's the type of thing you would automatically set aside. So you always look from the perspective of the skilled artisan, and you ask two questions. Is there something here that takes undue experimentation, what this calls painstaking experimentation to make? If you can find something, that might be concrete enough. And the next question is, does it matter? Does it somehow impede the skilled artisan from reasonably practicing that full scope in the invention? Well, how long? And that may be the wrong measure. But if you're judging reasonableness, how much experimentation do you have to put into it? And part of the allegation in your case is that this is simply trial and error. So how long does it take? Right. And I think the answer is, it always depends. You're looking at the skilled artisan, and you're saying, what is a skilled artisan in this art willing to do? It might take a long time for a skilled mechanic, for example, to build an old Buick from the ground up, a year. But it's not unenabled, because the instructions are there. He knows how to do it. There's no wrong cut. How long did it take Amgen to come up with the one? With the 384, it's from start to finish, injecting the mice and coming out. It's a matter of months to produce them. And I think it's important. And if the court will indulge me to describe how you get them. I promise one thing. Identify them. Do the whole process. Don't take a piece. I'm sorry. Then continue with justice. Okay. Yes. I think it's important to explain what's involved in getting from the 3,000 that Amgen, for example, got by immunizing two panels of 10 mice, or the 1,500 that Sanofi got from injecting a panel of mice, down to the 384 that you're looking for. Because that's, in concrete terms, what we're talking about. And so what it is, it's not a trial and error, like you're going through one after the other. You start with that 3,000, and you use our two anchor antibodies. And it simply costs $30, this is the record, according to the clinic, 3909, to go through those 3,000 to get down to 384. And why is that? It's because in 2008 at the time, there's these high throughput machines, wells of 384. And the testimony is that the robotics do it very rapidly and very quickly, thousands of wells, hundreds of plates, in a very short period of time. So someone's going to say it's undue experimentation to take these 3,000 antibodies that the mice produce, these humanized mice produce, and put it in a machine and wait for it to, at the cost of $30, that's undue experimentation. That is very odd. It's totally divorced from the nature of the art. And, in fact, Juan's decision that we all have been citing back in 1988, back then, 35 years ago, described and said, look, the process of filtering out the antibodies that you don't want, getting rid of that byproduct, is something that skilled artisans are prepared to do in the ordinary course. This is just what antibody scientists do. It's not undue experimentation. The patent examiner that looked at this understood that it was not undue experimentation, somebody who is themselves skilled in the art. Two juries didn't think it was undue experimentation. Can I ask you a clarifying question, though, because I guess I'm just trying to understand your argument relative to species versus genus. So are you saying that if we find undue experimentation with respect to a particular species, you know, that should not be enough to invalidate the patent? In other words, doesn't that undue experimentation have to apply to every species? No, we're not saying that it would have to apply to every species. If you find undue experimentation to make a particular species, the next question is, okay, does that matter to the skilled artisan, or is this just an outlier? Because the PTOs, as they say, it has to be commensurate, it has to reasonably correlate. But if you just have a one-off that doesn't mean anything to skilled artisans, you're not going to invalidate the patent. How many of those one-offs can you have, though? So in sort of numerical terms, how many one-offs can you have? If you have so many that it means you're searching for a needle in a haystack and you don't have instructions on how to do it so that it is that trial and error for years on end, it's Edison and Consolidated Electric going through every type of, then you would not be enabled. And there's a case called Atlas Powder from the Federal Circuit that explains that. But I guess I thought you'd have to have the undue experimentation standard applied to every species. No, Your Honor. I think you would do it for every category that matters. So if there's meaningful categories, and there's a case from the Federal Circuit called Autotekin that explains this, if there's meaningful categories, then you would have to enable across those categories, what Fibrogen called across the scope of the group. What are the categories here? So in this case, there isn't evidence before the jury that it really matters whether you bind to two, three, or seven. In fact, Sanofi's own expert testified that it has no correlation. There's no correlation between the number of amino acids that are bound and the blocking. And that's at Court Appeals Appendix 3787. So in a case like this, where you don't have evidence that they're anything but fungible, then you may only have one category. But in Autotek, for example, there was an impact sensor patent, and there were two types. There was mechanical and there was electrical. And it only taught the skilled artisans how to do the mechanical sensors, not the electrical. And for that reason, there was a requisite part of the invention that wasn't taught. The skilled artisans couldn't do. And so when you have that, then you have an enablement problem. But the fact that somebody can go and pick out one tiny enablement, one tiny embodiment, and say, oh, gee, this one would be hard to do, that swaps in for the perspective of the skilled artisan, the person who matters here, someone who wants to practice the claim. The creativity of an artist. Yes, I understand your point, I think. But, I mean, you've claimed 26. You say there's 300 or something antibodies, and then there's evidence that millions more can be made. So how is it that you've satisfied enablement by focusing in on the smaller group? So, no, Your Honor, I think that when you're enabling, the question is, can the skilled artisan, using the instructions you have, make the various embodiments, make the various variants? Without undue experimentation. Without undue experimentation. And that's exactly right. For any one, does it take undue experimentation? And if you find one that takes undue experimentation, the next question is, okay, does it matter? Does it really meaningfully impede somebody, the skilled artisan, the guy who cares, from doing it? And it's just never been the law. And that's in the Federal Circuit's case law, or are you just saying that right now? Well, actually, if you look at page 11A of the appendix, where the court quotes a decision called McGrow, that's actually the standard the Federal Circuit ordinarily would use, but departed from in this case because it was. Mr. Lemkin, putting aside what the Federal Circuit said in the opinion here, and the different views of how that should be read, do you understand the parties now all to agree on the appropriate legal test? And are we simply arguing now about how that test applies in this case? So I think the parties all agree that the cumulative effort, the idea of reach the full scope, that that cannot be sustained. Everybody agrees on that. And everybody agrees also, I take it from your answers to Justice Gorsuch's question, that there is a requirement that the full scope of the invention has to be embodied, has to be enabled. I think that's correct. The content of that is the subject of some disagreement, and then the question, once this court says... Yes, so I guess what I'm asking is, putting aside any application to this test, what do you think the parties don't agree on at this point with respect to principles of law? Yes, so I think the differences are as follows. The government would propose a requirement that you have a structure that unifies your genus, and I don't think that can be sustained under the law. It makes sense that if you enable people to make your invention by structure, they have to build it, that you teach the skilled artisan the structure that he has to build. But when you have an invention that's biological in nature, that's made by the mouse, the superhumanized mouse as you hear, you wouldn't describe it by structure, you would describe the process of how to make that. Put that aside. Any other disagreements on law? And if not, why isn't this just a fact-bound dispute? Yes, so it's not a fact-bound dispute in the slightest, because there is a disagreement also. Sanofi's test is what they call the specific undisclosed embodiment test, where if you hypothesize one that you – that's it, that destroys the patent. But that can't be right either. This Court's cases don't go through and hypothesize. Okay, so put that aside. Any other disagreements on law? No, I don't think beyond that. But I think that the key question on which we all agree, and which is actually critically important for this Court to do, there should be no mistake that the court of appeals decision saying that you reach the full scope or page 15A where they do this evaluation and they say, the evidence shows that the scope of the claims encompasses millions of candidates and it would be necessary to first generate and then screen each candidate antibody to determine whether it meets the double function limitations. That's a statement saying you've got to be able to make them all. That can't be right. And even having that, I think there's uncertainty as to what the Federal Circuit meant by that. That uncertainty calls for the Court to bring clarity, because you should make no mistake, this is a very damaging decision. The impact is tremendous. The PTAB now has twice invoked the decision for the idea that you have to be able to make them all within a reasonable period of time. It has to be able to do a cumulative scope test. And companies can't invest billions of dollars in new therapies when they confront the risk that their patents will be invalidated based on the cumulative effort necessary to make them all. And this is why you have, for example, 14 amicus briefs on our side and 14 amicus briefs on the other side. I've got a lot of amicus briefs. I've got so many friends I can hardly stand it. With friends like that, you end up staying up late reading. But the key is on this, if there's uncertainty about what the Federal Circuit did or doing, the answer is actually to bring clarity. The case is critically important to industry, and at least that. And once you get there, the question is, well, what other guidance can the Court bring? What other guidance should the Court give? And for us, the critical guidance the Court can give is that you're looking from this Court's case as the perspective of the skilled artisan who's seeking to make it. It's a reasonableness standard, which means that you're not from the perspective of somebody trying to create, oh, here's my hypothetical embodiment that won't work. It's from that perspective, and that means in concrete terms. Let's say we think that the Federal Circuit's decision is properly read to embody the test we've discussed this morning and that this dispute really is fact-bound. Do you want to remand for a redo? If we were to clarify what we understand the Federal Circuit's test to be and that you agree on and that Mr. Clement may or may not agree on, we'll find out. But would you want a remand to try again? So at the very least, we should have a remand so that we try again under the proper standard without the reach-the-full-scope standard or trying to hypothesize how long it takes to make millions of antibodies and then test each of them. But why? I mean, maybe I misunderstood Justice Gorsuch's question.  But if the Federal Circuit got it right, I don't understand why you're saying a remand is in order. Well, I don't think-I mean, the key is the Federal Circuit could not possibly have gotten it right because of what I just read to you from page 15, where it looks at the effort to make each and every antibody of the potential millions. And so at the very least, it has taken into account a feature that everybody now before this court says isn't even relevant. And we should go back for that. But I think if you look at from what we're asking, what we think the court's further guidance should be, that at the very least, somebody who's trying to overturn a PTO-issued patent and two jury verdicts should at least say, here's an actual antibody, an actual embodiment that is difficult to make. It requires undue experimentation to get there. And then if they have that, they should also say why it matters, why this is something that genuinely impedes skilled artisans from making and using the invention. Can I quote two sections from the Federal Circuit? Two statements it made, and you tell me whether they're right or wrong. The Federal Circuit said it was, quote-unquote, to look at the amount of effort needed to obtain embodiments outside the scope of the disclosed examples. Is that a correct statement of law by the Federal Circuit? It said, no, that's what it said, to look at the amount, appropriate to look at the amount. And if you're talking about the amount to make all or some number, the answer is no, it's not. If you're talking about making another embodiment that's not specifically characterized by amino acids- It said to look at the amount of effort needed to obtain embodiments outside the scope of the disclosed examples. So I think if it said unembodiment, that would be correct. Embodiment means that you're looking at the full scope or what it's called, reaching the full scope, and I think that is incorrect. All it said, it was appropriate to look at. Right. I don't think anybody before this Court thinks that the effort to make them all- Why is it inappropriate to at least look at it as one of the wrong factors? So the effort to make every single embodiment within the invention simply means that if you have an invention of any scope, it's not going to be enabled. There may be millions of ways to make the James Watt steam engine, but you're not invalidated simply because it would take a long time to make all of those different variants of the steam engine. This Court can do the best service to the Federal Circuit if it does one thing beyond simply saying this cumulative effort standard has no place in the law. And that would be to say- That's fine, counsel. I'm sorry? That's fine. You answered my question. Okay. Thank you. There's nothing wrong with it. You just don't want them to do it for every single one. No, I think it's not correct if you're looking at embodiments in the plural. If you're looking at an embodiment in the singular, that would be correct. And what they did wrong was they looked at how long it takes to make the supposed millions. If each of those is individually enabled, you can make each one individually and reliably, test it individually and reliably. That's an enabled invention. How long it takes to make all of them cumulatively simply has no bearing. And this Court can do a service and bring back to the incentives to create these life-saving inventions by making it clear that that just doesn't have a place. And you said we can do one thing beyond that, and what is that? I think it's by bringing it back to the focus of this Court's cases, which is we're looking at skilled artisans, someone trying to make the invention, and we're looking at reasonableness and not the hypothetical efforts to try and figure out ways to break the invention. And so if you're going to look at that, you're going to have to show two things if you're going to invalidate a PTO patent. One is you're going to have to show some embodiment. There's got to be something out there, some variant, something, some category that requires undue experimentation to make. And if you have that, you also have to say why it matters to the skilled artisan. How does this really genuinely impede the guy in the lab coat from making and using your invention across its scope? Is there something unique about the Federal Circuit's decision in this case, or has it been applying essentially the same approach to the enablement of antibody genus claims since around 2004? So as the Lemley article points out, there's been sort of a trajectory as it's been getting clearer and clearer what the Federal Circuit's doing, and it's basically hostility to the breadth of claims. And I think that this is basically the apogee. We've reached an endpoint where, frankly, the industry can't take it any longer because you can't invest $2.6 billion if the breadth of your claims is such that it means you can't get adequate protection, because if you cover everything you invented, then it's invalid because it's too hard to make them all. So, yes, I think it's been a trajectory as opposed to a point, but this is actually the ultimate point. Well, if what they did here isn't fundamentally different from what they've been doing for quite a period of time, would you stand by the suggestion that the Federal Circuit has inhibited research for antibody-based pharmaceuticals? I think the Federal Circuit has been doing that for some time, but it hasn't been quite so stark or quite so apparent until now. And I think that's why the Lemley article really was catching on to it, that this brings in very stark contrast, stark relief, exactly what the Federal Circuit is doing and why it has gone so far that you just can't invest in antibody research if you can't adequately protect the scope of the antibodies you invented. Amgen had the first antibodies here. Before Amgen and before our patent, these were not known antibodies. And our patent teaches everybody how to make each and every antibody they might ever want to make, including the defendant's supposed competitor antibodies. And if that's true, there's simply no good reason why you would take away the patent. The patent depends on what the skilled artisan can do, not the creative hypothetical of the infringer who says, gee, you know, I can imagine a hypothetical antibody that can't be made. In this court's cases, like mineral separation, they don't hypothesize limits. Like mineral separation, the court didn't hypothesize. You know what? There might be an ore out there for which this is going to be too hard, even though there were infinite varieties of compositions of ores and each presented its own particular difficulties. The court, Justice Dorian Carver, didn't say, gee, you know what? I can imagine a type of cotton for which this might not work. The court in Maori didn't say, you know what? There might be some train wheels for which this cooling process won't work. That isn't what the court does. You look at concrete evidence. What are the skilled artisans doing? Is there something here that can't be done? And if there is, you ask if it matters. Can you explain how your roadmap differs from the basic research plan that you and your competitors have been using since the mid-2000s, when you were all attempting to discover or identify antibodies that bind to PCSK9 and block LDL receptors? Yes, and I think the first and most critical thing about the roadmap is these two new antibodies that didn't exist before our invention. One sits a little bit on the left of the PCSK9, one a little bit on the right of PCSK9. And what those do is they allow you to find everything that will bind to the sweet spot in PCSK9 because they cover it completely. The way this is done is you do a competition assay. If one antibody is covering it and it blocks the other antibody from doing it, you know that they're binding to the same spot. And by providing these two, that is a shortcut to finding these because you run your competition assays against these two. And that's why in the roadmap, the very first step are these two antibodies that didn't previously exist but will lead you to your dividing rod, your magnetometer, or whatever you want to call it, to all the antibodies within the claim. Thank you, counsel. Justice Thomas, anything further? Mr. Lampkin, several times you referred to invention of the antibodies. And I think I'm somewhat confused as to exactly what your invention is. You said it's not just the 26, but it definitely is not million. So what is it exactly? Because we talk about enablement and we talk about someone being able to replicate it, but we're not talking about what has been invented with any particular precision. Right. And I think the claims are, which define the invention, the class of antibodies that bind to a particular spot, what's called the sweet spot, and therefore have what is a desired effect, which is blocking this PCSK9 from interacting. I understand all that, but which ones? Yeah, I should clarify. When you say invention, like the James Watt steam engine, you don't say which variant, which embodiment of the steam engine have you claimed. It's the steam engine, that principle, the invention which encompasses myriad types of inventions. You might be, in this court's case, let's describe it. There can be lots and lots of different variations on an invention. But to determine what the invention is, you look at the claim. And the claim tells you what the scope of that invention is here. And the fact that it's described in terms of what binds to a particular location, which has been decried as functional, but that actually is an important way of doing things in antibody science because it leads to a shape that fits into that unusual sweet spot. It's also clear that you can do that because 112B, we're talking about 112A right now, that's enablement. But when you talk about how the patents are claimed, that's a different section of the Patent Act. It's section 112B. And it says that the claims have to particularly point out and distinctly claim the subject matter which the invention regards as the invention. That's just not at issue here. The PTO regularly issues patents which have that sort of functional piece that says things that fit in this location or have this characteristic. You know, you refer to the steam engine, but that's not, it just seems as though, I grant you that, but it seems as though you're actually trying to patent the use of steam pressure, which you could use for almost anything. And that makes it very difficult because then you're looking at what can it be used for. So here I'm still not getting. If you said we're just patenting the 26 that we have found or the 300 that we have found, I don't think we would be having this discussion. And what I'm trying to understand is what it is that you're patenting beyond the antibodies that are there, those 300 or those 26. Right. And I think if you're asking what is the category of the group of meaningfully distinct antibodies that fit in that claim, we're talking about something in the range of 400. But if the question is different, if it's asking what do you mean when you say the antibodies that bind to a particular sweet spot and therefore block, that category is what we invented. That didn't exist before. We teach the world how to. So you invented the category so you're not claiming just the antibodies, but the whole category of those antibodies. That is the nature of a genus claim or any claim that has considerable scope. We don't claim just the variance of the steam engine. You categorize the steam engine. And that's entirely legitimate. So let me ask you this question. How do you respond to the example in one of the amicus briefs about the complicated lock and that you simply figure out the combinations by trial and error? Yeah. And I think the answer is for enablement here, which is the question. The roadmap gives you all of the antibodies that are going to fit to that spot, all the ones that are going to fit into those hills and valleys. The evidence is the roadmap gives them all because if the mouse has the DNA to produce them and the robust immunization protocol is going to give you something across the full spectrum of the claims, that is within the claims. And I should point out that this enhances innovation. Look, the patent means that others aren't going to go in separately. They're going to look for things that are separately patentable. It pushes them away from sort of copycat antibodies that operate on identical principles in identical ways with identical results. If you truly want different therapies, you protect this sort of patent, and it tells people, well, if you're going to do this sort of thing, it has to be better and separately patentable as a result. Or it pushes them to completely different non-antibody treatments. Novartis, for example, has an siRNA solution that they're working on. NovoDortis is looking at a small molecule, which means you might be able to take it as a pill. Or you have antibodies that work by a different principle. So Novartis has an H1 fab that binds outside the sweet spot but blocks anyway. Or Merck has something called 1G089, which binds on another location still, but it mitigates the impact of PCSK9 not by blocking but by affecting how it affects when it's absorbed into the marrow. Thank you. Justice Alito? Justice Alito? Justice Gorsuch? Just a couple things to make sure I'm clear. You said that, Justice Gorsuch, I think that you accept the Federal Circuit precedent once. Are precedents also precedents that you accept, or are there any that you would say have steered us in the wrong direction as we approach this? Your Honor, I accept all of this Court's precedents. And I think I should be clear about Juan's. We think those factors can, in individual cases, be helpful on the facts, but it's being abstracted to replace what is actually the statutory text. And this Court's approach was just to concretely look at actual examples, to concretely look at the skilled artisan, concretely look at reasonable enablement, not to look at the abstract hypotheticals of, gee, is there some outer limit that I could find that has just no impact on what the skilled artisans really need to do, which is make and use to practice the invention. In the interest of providing clarity, the Solicitor General's brief at pages 14 and 15 had three hypotheticals about cake, stew, and bread. I don't know if you're remembering all three of those hypotheticals, but do you agree with how they presented those, if you remember them? I'm having a hard time remembering what they were exactly, but certainly if the skilled artisan knows what the ratios for the ingredients are for cake, you wouldn't invalidate the patent simply because it doesn't give the ratios. That's something the skilled artisan can provide. And sometimes things like that, which are chemical interactions, aren't particularly good analogies when you're dealing with a biological invention, which is the way you make and use this, the way you generate these antibodies, isn't by following a cake and bread formula. It's by super-immunizing the mice, taking the results and filtering them down using this high-throughput process that goes very quickly, down to the ones you desire. And if that gets you every embodiment within the claim or every embodiment that anybody cares about, it's enabled. And someone who has the clear and convincing burden before the jury is a critical point, and then when the jury rules against them, they have the burden of proving that no reasonable juror could think they failed to meet their clear and convincing burden, that's a very high burden. And it means you're going to have to come up with something concrete that can't be made or requires undue experimentation and explain why it matters. Thank you. Justice Barrett? Just one question. What if before the jury you have an expert who shows why? I mean, proving the negative would be pretty hard for Sanofi to do, right? So what if you have an expert who can tell the jury, this is why the function described would not be capable of producing them all? Yes, so I think that is one way to do it, and they could even also say it would take undue effort. But in this case it's interesting because you have no testimony saying why it would be, in principle, on some reason basis, harder to make Prolulent or the competitor antibodies than what Amgen produced. And, in fact, our expert, Dr. Reese, explained that he thought that even Prolulent was among our original 384 because the mouse's DNA can make it, and you have a super immunization protocol, which means you get a robust result across the claims. And so against that evidence, when they have the burden of proof, they're going to have to explain pretty convincingly to the jury, clear and convincing evidence, why there's something out there that isn't easy enough to make that it doesn't constitute undue experimentation. Thank you. Justice Jackson? So I understand your burden points, but is there evidence in this record that the experimentation required to produce undisclosed species using your roadmap is routine? Yes, Your Honor. The methods disclosed in the roadmap are routine as routine can be. This is what skilled artisans have been doing since 1988, and the WANS factors, we said this is routine. Filtering out what they call the hybridomas, or what the antibodies that aren't wanted, to get the antibodies you want is routine. And I give you one example. So our expert explained that all these machines that are used for it would be in any properly organized lab, and would do it rapidly and very quickly, thousands of wells, hundreds of plates in a very short period of time. That's as routine as routine can be. This is what antibody scientists do. And can I just go back to Justice Thomas' point? So given the routine nature of this, can you just help me understand the numbers? So you did this and got 26, but you say there's 300. So the patent itself explains, and this is on page 236 of the Court of Appeals Appendix, that when we did around two panels of 10 mice, we got 3,000, which were filtered down to 384. The 26 are something different. The 26 are the ones where we went through and figured out the exact amino acid sequence and then listed them in the patent. And there's a reason why you don't go and do 384 amino acid sequences for every one of them in the patent. First is the patent laws never required you to list all of your embodiments in there. That's just never been a rule. And it's not a rule for good reason. The patent act requires you to have your patent be concise. Our patent is already 380 pages long with just those 26 amino acid sequences. But isn't the question whether starting with the 26, someone without undue experimentation could get to the 384 and then possibly to the 3,000? Is that the way to look at this? No, Your Honor. I think the 3,000 that the mouse initially produces, only 384 are going to bind to the sweet spot. So you don't want to go the reverse direction to the ones that don't bind to the sweet spot. All right, but at least to the 384. Right. So you would go from your 3,000 to your 384, and that's where you stop. Now, if you want to make variants of those that may not be meaningfully distinct, you can do something called conservative substitution. And the patent explains that that is also a routine and well-known way of doing it. Can I just ask you a very simple one? So you say that you are claiming the class of antibodies that bind to a particular spot and therefore block. That's my sort of shorthand for what you've said. So is that class comprised of 384 species or more? You know, it's somewhere in the 400 range. I couldn't tell you if that's exactly 384. I would say that that 384 probably covers the full range of meaningfully distinct antibodies. So when you see millions, someone said millions, you say that's not even reasonable. So it's important for me that the millions comes from a different way of making additional antibodies. You start with one that works, one of those 26, for example, and you swap out amino acid or two for one that's very similar according to a table that's in our patent. So would you be claiming those or not? Yeah, so those are fully enabled because it's very routine. The patent describes that it's routine to swap out one amino acid for another that's very similar. And the evidence shows that those routinely work. But even if it were, you know, you could make millions that way. And you could count, hypothetically, by swapping out every single one of these amino acids along this chain. So just to be clear, you're beyond the 400. You claim all of the swaps. Yeah, so those swaps are all enabled. They're all within the claims. There's two pieces to it, though. First, an antibody scientist isn't going to look at that near-identical twin and say, that's a different antibody. That's the 99.9% similar. That's going to be basically the same antibody. But even if you want to consider that a different antibody, it's enabled because everybody is able to do that routine process of swapping out the amino acid. Everybody, if you want to test it to confirm that it works, it's probably not necessary because the evidence showed that they all reliably work. Sanofi didn't identify a single one that doesn't work, that somehow breaks its ability to bind. If you want to do testing, that's routine. So any one you want to make from those 26 by doing an amino acid swap, you can make it. That is clearly enablement. That's what you're looking for, the ability to make the next one and always succeed in making it. And it's routine across the board. And you think that gives others enough notice as to what you've claimed? I mean, to the extent that you could swap out any of the antibodies and suddenly we're in the millions, I guess I had understood the patent also was, to some extent, your specifications were about notice to other people and other inventors. So certainly it's very easy to determine whether or not you're inside or outside the claims. And there's two different techniques you could use. One was I talked about with the competition assays. If you compete with something that binds the sweet spot, if you can't bind when that's already present on the sweet spot, then you're within the claims because you also bind the sweet spots. There's also something called alanine scanning. And alanine scanning in 2008 was very common. And it not only tells you if you bind the sweet spot. It actually tells you the specific residues that you bind to in the sweet spot. But I've got to do the experiment in order to know this, right? You would have to do that. But it is routine to do that. It was routine in 2008. And it's not at all, when you're dealing with something very small, you can't always just sort of hold it up and look at it to see if it matches. You're going to have to do a little bit of work to make sure that it's true. All right. Thank you. Thank you, counsel. Thank you. Mr. Clement. Mr. Chief Justice, and may it please the court. Section 112 sets forth the heart of the patent bargain. The more you claim, the more you need to enable. If you claim a lot and enable a little, the public is shortchanged and the patent is invalid. The Federal Circuit has long enforced that basic principle by requiring the patentee to enable the full scope of the patent without undue experimentation. Amgen does not take issue with that test, with the wand factors, I think, or the vast bulk of the Federal Circuit's enablement precedent. But the full scope test, which they don't take issue with, at least as I understand it, dooms their claims here as well illustrated by the chart on page 15 of the red brief. Amgen claims antibodies that bind on 16 residues in the epitope, but their specification does not enable skilled artisans to reliably produce them when they bind at 10 or more. And those aren't hypothetical examples. Those are the competitive antibodies independently developed by their competitors in the four right-hand columns. Their disclosed embodiments, the 26, do not bind at more than nine residues. They've over-claimed, they've under-enabled, their patent is invalid. This court has long applied the same principle in Morse, in Lamp, and in Holland Furniture. Samuel Morse invented the telegraph. He did not invent the fax machine. That is why this court correctly rejected the final broad functional claim in his patent. Thomas Edison discovered the key to incandescent light. But we'd all be fumbling around in the dark if this court had not invalidated the broad, unenabled claims in Sawyer and Mann's patent in the Lamp case. The stakes here are comparable. Pfizer independently developed its own antibody and patented it by amino acid sequence. It seemed like a promising candidate, but it failed in clinical testing. If Pfizer had followed Amgen's lead and claimed the whole genus for its own, we would have no large molecule therapy for cholesterol. We're better off with two competing independently developed therapies. I welcome the court's questions. Mr. Clement, could you just reiterate or at least expand on what you said about what is being claimed here? You made the point that the more you claim, the more you have to enable. And I think it's important to, since the starting point is what you claim, I'd like to have a good sense of exactly what we are talking about. So the numbers don't lie, Justice Thomas. I mean, my friend likes to come up with that 384 number. That is not the scope of what they have claimed as their invention. The numbers don't lie. They have claimed millions and millions of antibodies, and their reassurance that, don't worry, all of those millions that you get with conservative substitution, they're all going to work the same, that's inconsistent with their own experts' testimony in the court below. Drs. Reese and Drs. Pesco testified to this. Dr. Pesco, their expert, Court of Appeals Appendix page 3891, says if you change one thing in the antibody sequence, you have to retest it. You have to go through that whole experimental process again to confirm that it binds in the right place. And, I mean, look, I can imagine this is frustrating because Mr. Lampkin and I are going to tell you different things about the way the science works here. Please don't take my word for it. Please don't take Mr. Lampkin's word for it. I urge you to read Sir Gregory Winter's amicus brief. He has gotten a Nobel Prize for his contributions to this field, and he will tell you that you can't look at function, and part of the problem here is these are purely functional claims. You can't look at function and say, oh, that tells me about the structure of the antibodies that are going to bind and block in the right way. And you also can't look at the structure of one antibody and say, oh, if I just tweak it a little bit, it's going to do exactly the same thing. Sir Gregory Winter doesn't think that. Their own expert doesn't think that. And if I could try to address one thing that's come up, I do not agree with Mr. Lampkin that everybody here says that the cumulative effort is irrelevant. It is not an appropriate test standing alone, which is why the Federal Circuit didn't apply it as the test. It never even used the word cumulative. But as Justice Sotomayor in her question said, is it an appropriate consideration? Yes, it's an appropriate consideration. And if I could illustrate that with a hypothetical, here's a situation where the cumulative effort to exhaust the species would not be particularly relevant. If I came up with a brand-spanking-new process for making paint, and I claimed that process and all the paints that were produced as a result of that as new compositions of matter, and one step in my process patent was add pigment for the desired color, well, then a skilled artisan would be able to use that, an actual roadmap, and they would say, all right, I want robin egg blue. And they could produce it every time. And if they wanted chartreuse instead, they could produce it any time. Now, obviously, there's a lot of colors in the rainbow, so to actually produce every one of them would take a lot of time, and it wouldn't invalidate the patent because it enables the skilled artisan to produce what they want every single time. But this patent does not work this way. What they give you is, their roadmap is trial and error. Mr. Clement, I appreciate that clarification, but as I understand it, there is a point of agreement with respect to cumulative effort that that should not be dispositive. Absolutely, Justice Gorsuch. Okay, and... That's not just... No, that's great. That's enough. The other point that Mr. Lampkin suggested that we should clarify is that there has to be a reasonable embodiment, not an embodiment, enablement, sorry, in every instance, that it just needs to be reasonable. Do you agree with that as well? I don't know if much turns on it in your case because millions are millions, and reasonableness is going to be somewhere. You could still prevail under that standard, but do you agree with him that it's reasonable enablement, not down to every jot and tittle in every... Yes, I think reasonable is just maybe the flip side of undue experimentation. Exactly. So if we agree on the law, what's left for this Court? Nothing, except maybe a dig.  That seems... And honestly... Mr. Schmidt, is there any other point in the law that you feel as though you and Mr. Lampkin are in disagreement on? Well, I think there is a disagreement as follows. Mr. Lampkin thinks it's very helpful to his case that somebody who runs the experiments necessary in the roadmap is going to produce an antibody within the range every time. And I think that can't be right. It can't be particularly interesting because that rewards breadth. And what skilled artisans want is not to randomly generate something within the broad range that's claimed, but they want to be able to pick a specific embodiment, not a hypothetical one, but a specific one. So just to give you a concrete example, I mean, if they claimed a 15-binder, there are 15 binders in the real world. If you want to use their roadmap to produce a 15-binder, you are consigned to trial and error. So I understand that as a view of the inadequacy of their roadmap. But are you trying to suggest that it's reflective of a disagreement about what the legal principles or legal standards are? I think it must be because Mr. Lampkin is a very smart man. And he makes a big deal out of the fact that, don't worry, this produces something in the range every time, and skilled artisans can produce something in the range every time. And if you give them an infinite amount of time, they will produce everything in the range. And she seems to think that that's good enough as a matter of law to enable his patent. And I think, wow, that is not close to good enough. That consigns people skilled in the art to Sisyphean tasks forever. And it's not what they do. And one of the things I find particularly persuasive about Sir Gregory Winter's brief is he explains, this roadmap is not a shortcut at all. It just describes the routine processes that people use to make independent inventions, the same process that Pfizer used, that Merck used, that we used to get our own independent antibodies. And then it adds additional steps that somebody skilled in the art wouldn't want to do and are just basically an additional step, additional test they have to run to see whether they infringe. Because the people that are skilled in the art don't really care where it binds. They care that it blocks. But figuring out where it binds, whether it binds to the 15 that they've claimed as part of their roadmap, is actually a useless process that slows down the artisan in the field. And I do think there's an important point that shouldn't get lost in all of this. Part of the reason I agree this isn't a close case is because what they are trying to do, there's no meaningful structure in these genus claims. And the structure they've given is an elaborate description of the epitope, the 15 or 16 residues on the PCSK9, where you want the antibodies to bind. The problem is, and the reason they can't claim that as an invention, is because of this court's myriad case. Because that exists in nature. These antibodies are independently generated by scientists, but the antigen and the epitope, all of that exists in nature. And so what you have before you is a particularly pernicious kind of claim. Because not only is it a genus claim that's purely functional or double functional, as the Federal Circuit described it, but it's really a workaround of myriad. Because basically they're pointing to something that exists in nature and they're saying, we claim everything that works to bind there and block. Mr. Clement, can I just take you back to what you said about cumulative time and effort? Is time and effort relevant at all or is it the nature of the effort that's required? So you say cumulative time and effort is not the test. But at the other extreme, is the relevant factor the effort necessary to make and use any individual or monument? So would you just clarify what is the relevance of time and effort? So I think they are both relevant. I actually agree with Mr. Lamkin that they're both sort of relevant evidence that gets to the ultimate inquiry, which is, is there undue experimentation? And in some respects, the more important word isn't undue. It's experimentation. And let me just contrast the particular claims that go by antibody sequence. Our claim to prolulent, their claim to Repatha, the Pfizer claims, they give you the amino acid sequence. And so somebody, a skilled artisan, every time doesn't have to really engage in any independent experimentation. They can look at it, they can reproduce the amino acid sequence. Regardless of how much time it takes, there's no experimentation in there at all. But under their broad genus claims, you can't do that. You can do it as to the 26 and we'll give them the 26, but as the chart on page 15 shows, we're not even close to infringing the 26. We are structurally fundamentally different. So to get to the genus, what you do is you go in a lab and you start injecting mice and you inject them with the antigen, PCSK9, and then you get a bunch of antibodies that are produced. Then you pour them over and see which ones bind on PCSK9 and you might be able to test them for blocking. But Mr. Coleman, isn't the issue whether or not that is not routine or that's undue? I mean, you sort of took undue out of it, but as I read the test or understood the test, some experimentation by the skilled artist is allowed. So how do we know whether the steps that you're talking about are undue for the purpose of the standard? Well, here's the thing, Justice Jackson. I think the problem is in certain scientific areas, a form of experimentation is routine, but it's still experimentation and it's still not what you're supposed to get. When a patent, you're not supposed to just say, all right, do what we did. Start from scratch, start with mice. Yeah, but it sounds like you are going beyond the undue experimentation test. You're saying that unless the claims in this patent are such that a skilled artisan could pick it up and go right from one to the other without any experimentation, the patent is invalid. And I didn't understand that to be the case. And then I must have misspoke because that is not my position at all. Isn't that what predictability is about? Isn't it the work of predictability in your argument that you say unless you can predictably, by doing what the roadmap says, reach this particular result, the patent is invalid? No, the predictability goes to experimentation and undue. If you have something that enables the skilled artisan to pick essentially any point in the genus, as in my paint example, I want a particular shade of paint, I can produce that one very readily. I mean, maybe I have to do a little bit of mixing with the pigment, but that doesn't, that's not the kind of thing, that's the reasonableness, that's not a problem. But if you tell me that the way I have to produce robin blue, robin egg blue paint is to just throw in a pigment and wait until, like I'll get a random color and wait until robin egg blue comes up, that is both undue and it's experimentation and it's not covered by the patent. I was just trying to explain to Justice Alito that I think both words are important because there are some things that are, involve time and effort, but they're really just sort of tweaks at the margins and I don't think it's an accident, just to go to this court's cases and the cases my friend relies on, I don't think it's an accident that all his best cases are process patents because if you think about a process patent, it's often gonna be the case that if it's, if you have a process patent for making bricks or for cooling railroad tires, well, if it's a humid day, it might react a little bit differently. You might have to tweak it a little bit to get the mix right on a humid day and it's different from a day when it's zero humidity. And in the same way, if it's 90 degrees out, maybe your cooling process for the wheels differs if it's 30 degrees out. And those are the kind of tweaks that you expect a mechanic to be able to do and you'd say that's without undue experimentation. But it seems quite strange to me that when you're claiming compositions of matter and millions and millions of them, that the only way that you can get there is to essentially replicate the experimental process that the four innovative companies went through to come up with these in the first place plus, as Sir Gregory Winter says, an additional step that doesn't help anybody but just ends up taking more time because you're basically testing as to whether or not you infringe their patent. Mr. Clement, could you put things in simpler form for me? It sounded to me that your adversary was saying that most of this work is done by computers, that you inject the mice, the antigens appear, and the computer then sorts them out to see which has the sweet spot or not. That's what I understood him to say. And if that's true, I don't know why that's undue experimentation or why it's costly or why it's time-consuming. You're saying there's more to this process than that. So break it down to me into steps so that I can understand why you're saying that this is undue. I understand it with the paint, but I'm not understanding it with this process. So in this process, let me just hypothetically say what would happen if I wanted to say, if I were a scientist and I wanted to say I want to use their roadmap to produce a 15-binder because I want to test whether the 15-binder is any better than the 7-binder, which is their Rapasa. And I want to be able to test that. I'm a scientist. So here's what I would have to do. All right. So the difference is in his way of doing this, he's not telling me how to find his... He's not going to give me a way to get to his drug without undue experimentation. Is that your point? That is my point. It's not my only point. Okay. Because, you know, I think this most dramatically illustrates it because I assume that's what somebody in the field would want. They wouldn't want a randomly generated one somewhere in the genus. They'd want to say, well, Mr. Lamkin tells you... Well, I don't think we care about what people want. We care about what's being claimed. Okay. But he's the one actually who cares what a skilled artisan wants. And what's being claimed is this entire genus. And if I want to pick a spot... So go back and tell me what steps you have to do to get to him. Okay. So I have to start by injecting mice, which is not just done with, like, you know, computers. It's done by scientists in the lab. They inject the mice with the antigen. Then they get... I did that and I wasn't skilled. Go ahead. Okay. Well, I'm more skilled than I am. So you get the results of that. You get a whole bunch of antibodies. And then you have to figure out which ones are essentially candidates to bind on PCSK9. So does the computer do that? And why is it undue? Do they have to look under a microscope? What do they have to do? I think it's a process they do in the lab. I don't think they actually do that with the computers. Then they get to the next step, which is they have... You might think of it as, like, their candidate antibodies. And then they have to test them to figure out whether they bind on the 16 residues that are claimed. And that is a time-consuming process. It is not just a simple matter of, like, running a computer. Again, people do that in the labs. I don't understand all the details, to be candid. But here's what I do understand, is at that process, let's say they get, you know, 26 or 384. Then what they wanted was a 15 binder to start with. They got to figure out whether they got one. And there's an excellent chance that they didn't get one of those at all. Can I ask this question? Sure. So the 26, you agree, fair enough, Mr. Lampkin's got that in the bag. What about the 384? He doesn't get the 384. Why? He didn't disclose them by... I mean, he could have got them if he gave me the amino acid sequence for all of them. But the reason that he doesn't get the 384 is because he didn't tell us anything about the 384. Let me just pause there for a second. I understand completely your argument. I think I understand completely. Let me put it that way. Your argument about conservative substitution and the potential millions of variants and the trial and error that's required there. I'm not sure I understand how that applies to the 384. So, like, honestly, the 384, I just have to take Mr. Lampkin's word for it. I mean, he says that, oh, progulant might have been in there. I mean, please. If progulant were in there, their scientists would have produced that evidence. And if you look at the chart at page 15, it is not a surprise. I assume that the 26... That's a nice demonstrative. I've got it. I assume the 26 must have been representative of the 384. Right? Otherwise, why not make one of those other 384 the ones you do by amino acid sequence? So if you look at the 26 that they give you the amino acid sequence, they look structurally nothing like the four antibodies that were independently developed by other companies. That is very striking to me. Thank you. Justice Thomas? Justice Leo? Justice O'Connor? Mr. Clement, can I ask you to address Professor Lemley's brief? He has a... seems to have a very strong view that these antibody genus claims are valuable, or patents are valuable, or potentially so, and that the Federal Circuit's test is going to pretty much wipe them out across the board. So why is it that Professor Lemley is wrong, in your view? So I think he's wrong on a number of levels. I think he's wrong that the existing Federal Circuit precedent is going to foreclose all genus claims. I mean, the Bayer case that we cite in our brief, it's an example of a genus claim that the Federal Circuit recently upheld. Now, it may be that in this particular area of antibody science, given the current state of the science, that you may not have an ability to functionally claim a genus. And that's kind of, at some level, nobody's fault. It's just the way the science works. And personally, I think that's great, because what it does is it allows different companies to independently develop different large molecule therapies to deal with the same malady. And if you look at the Fish and Richardson brief, it goes through and shows that there are a number of situations where there's one antigen or pathogen that people are trying to target, and they target with different multiple large molecules. And that can be hugely important. I mean, I want to make clear, my friend and I do disagree on a factual matter. He wants you to believe that everything in this genus is fungible. And, of course, it's fungible with respect to the two functions claimed by definition. But they're not functional. They are different compositions of matter. They can work very different ways. Somebody can tolerate one and not the other. And the best evidence of that is the Pfizer experience, right? The Pfizer antibody is in this genus, and when it went into clinical testing, it fell down. So if amgens had fallen down for the same reasons that Pfizer's did, we'd be without the treatment, because they'd claim the whole genus, and they wouldn't enable it. So tell me if this is wrong. As I understand, Professor Lemley could be wrong for one of two reasons, right? He could be wrong to say that the Federal Circuit test is going to basically invalidate all these patents, or he could be wrong in thinking that these patents are valuable. I hear you saying that you might be right about the Federal Circuit's test invalidating most of these patents, but that's okay, because we shouldn't want these patents around. You know, the truth has a way of leaking out. I mean, yeah, I am saying that, because I think functional genus claims are terrible. I think they retard the science, and I don't think you have to look beyond this court's cases. The eighth claim in Samuel Morris' claim, the other ones were nice species, structure, good stuff. The eighth one was a functional genus claim for everything that allows letters to print somewhere else through the use of electricity. This court deep-sixed it, and thank goodness, because Samuel Morris is brilliant, but he didn't invent the fax machine. And look at the lamp case. I mean, they claimed the entire genus of all fibrous textiles. Turns out the one that they discovered didn't work very well and was a lousy lamp. And Edison had to go through all this different work to find out that there actually is like a sub-genus. It's called bamboo. That stuff all works, and it all has the same structurally common feature of really parallel fibers. And that's the way. I'm not against all genus claims, but you've got to get some structure in there. And as this court's cases teach, it's got to be structure that unifies the genus. And I love Lemley, but I take Sir Gregory Winter on the science, and what he tells you is in this area of science that you just can't get that structural commonality. It just doesn't work. I mean, maybe somebody will discover it, and they will get another Nobel Prize for discovering it. Thank you. Justice Gorsuch? Justice Kavanaugh? Justice Jackson? So there are some fields where there is a degree of unpredictability or randomness, and I guess I'm just a little worried that your view on this would mean that we would not be able to have patents where some experimentation was required. Can you just speak to that a little bit more? I mean, again, I hear you in some way suggesting that the specification has to absolutely get a skilled artisan to the end point of every species in the genus 100% of the time exactly as indicated. And I'm just concerned because there are going to be some areas, and perhaps this is one of them, where there's a reasonable degree of unpredictability in terms of the outcome, but you're sort of in the ballpark enough that we would want to make sure that there was innovation in this area with these kinds of companies investing in patenting these kinds of developments. So I think what I would say is I do think the test should be undue experimentation. It should not be zero tolerance, no experimentation. But I also do think if you're going to start with the text, which I assume you always do, then what you would say is you start with the idea that you have to make and use the invention. And the invention is defined by the claims in the invention. And in that sense, Amgen's the master of their own claims, the master of their own patent. And then you look at those, and if they claim a lot, then you have to enable the full scope of what you claim. And then from that starting proposition, which might get you to the idea that there's no experimentation, then I think it's a little bit of, you know, noncurate lex, reasonableness, a little bit of play in the joints. But this is where Mr. Lampkin and I just see the facts completely different. He wants to say, oh, well, these are just hypothesized things that couldn't be invented here given the current state of the science. With all due respect, Balderdash, I mean, there are four disclosed patents here with anti-amino acid sequence that the competitors have made that are on the chart. Now, if you are a skilled artisan in the field and you want to produce the 15-binder that Pfizer did, you can produce it 100% of the time by duplicating the amino acid sequence. But if you want to use their roadmap to get a 15-binder so you can test to see whether his claim that all of this is fungible is really right and it's no better than the 7-binder, I mean, get a big cup of coffee, because it is going to take forever to run all of the tests that are going to be necessary and you can run them all, and you might not get a 15-binder, and then you have to start over. One last question on the facts. I understood that Amgen had trial testimony in this case that the roadmap is certain to make all of the claims antibodies, including Sanofi's, Pfizer's, and Merck's. And I understood in terms of the way the burdens work, a little complicated, but that you had to have evidence disproving that by clear and convincing evidence. So do you, and if so, what is your evidence? So I appreciate the question, and this really goes back to the suggestion that there is sort of a lurking legal difference here. Because the reason I don't have evidence that says that that claim is not true is because it implicitly says, if you take forever. I can't tell you that if you run these experiments, you won't eventually get Prolulent, Pfizer, the Merck embodiments, but unlike the paint where you can start and say, all right, I want to test that, so I'm going to reproduce that. You can't do that. So the twin claims that my friend keeps making, and he seems to think are legally sufficient, and I definitely disagree, are if you run the test, you're always going to get something in the genes. Thank you, counsel. Thank you. Ms. Sinzak? Mr. Chief Justice, and may it please the court, I think I want to pick up where Respondent's Counsel left off with a very important fact, and that is that if an antibody has already been created, a scientist who wants to make that antibody is not going to go into a laboratory and inoculate a mouse. They're going to use the amino acid sequence. That is the recipe for making the antibody. That is why the government says that for the 26 exemplars within the patents where Amgen has actually listed the amino acid sequence, those antibodies are enabled, because if a scientist wants to go into the lab and it wants to make that antibody, it has the recipe. It has the amino acid sequence. And I also do not want you to take my word on the science, but I do want you to take the expert testimony on the science. And I think that if you look at Trial Transcript 225, you will see that Respondent's expert explains that the amino acid sequence is the recipe. If you look at the winter brief at 14, it explains that the amino acid sequence is the recipe. And if you look at Amgen's own brief at 13, it says how should you start their roadmap. You should go in and you should use the amino acid sequence of the antibodies that they actually invented and make those antibodies. And then you should go through this whole elaborate mouse inoculation process. So the reason here, just on the clear facts, that this is not an enabled genus, is that they have not given the information that a person skilled in the art would need to make and use all of the antibodies within the genus. It really is that simple. And I think that we need to be very careful when we hear claims that this is complicated science and we need to start going beyond the basic text that says you have to be able to make and use the invention. We have to start relaxing the rules. And we have to say not can you make and use every antibody within the genus, but do you really need a particular antibody? Does it really matter, I think, is what petitioner's counsel said. It is very dangerous, I think, to start asking those kinds of questions because the truth is we don't know if it matters. This is an unpredictable field. This is a field where developments are getting made every day. And they haven't made certain antibodies within this genus. We don't know if one of those antibodies is going to be the one that really works to beat the cholesterol problem that causes heart attacks, that works better than everything else, or the one that's going to be tolerated by more patients, or the one that's going to be cheaper to manufacture. We don't know that. And so we can't say, oh, does it matter? What we have to ask is, is it different? And this isn't some new rule that I'm coming up with. Under the patent law, it has never been the case that you say, oh, is this better? You don't have to build a better mousetrap. You have to build a different mousetrap. And here we know that the respondents, they built a different mousetrap, right? Their antibody, it binds to different parts of the antigen. So it is different. It is not simply the same. And I actually think you see in the reply brief that even Amgen knows it's not the same, because the government explained that there is a doctrine out there that prevents copyists, that prevents someone from making a great invention and then having someone else just make a tiny change and knock it off. And it's called the doctrine of equivalence. And it's been in this court's cases for two centuries. And Amgen says, we can't use the doctrine of equivalence here. And the reason is because they're not equivalent. And because they're not equivalent, you have to enable all of the different antibodies. So again, this is just the basic principles. It is the enablement requirement that has been in the law since the beginning. And I think, Justice Kagan, you said, well, actually, Professor Lenly is very worried that this enablement requirement is going to harm innovation. But Professor Lenly has a new article from 2023 Yale Law Journal, which is called the antibody patent paradox. And in that, he says, you know, it doesn't look like these antibody patents. It doesn't look like these genus patents are enabled. But there is this doctrine of equivalence. And maybe it would take care of all of these innovation problems. And I think, honestly, even if you look at footnote 300 and 99 of that original Lenly article, the death of the patent genus, in that footnote, it says, now, there is a case happening right now. It's Amgen versus Sanofi. And it doesn't really seem like that genus is enabled. But, you know, it's not enabled for a different reason. So I think there are some concerns going on with the enablement requirement. I still actually think that the concerns that Lenly is expressing can be dealt with through the doctrine of equivalence. And I can explain a little more what I think is happening there with respect to chemical genuses. But whether you think that's true or not, it's simply an entirely different question. I think, Justice Jackson, you were talking a little bit about the predictability. And this is an unpredictable area of science. And how are we going to deal with those sorts of things? I think it is correct. This is an undue experimentation question. And we're going to say, like, is this something that a person skilled in the art is going to be willing to do? And quite honestly, at the time of WAND, I think that people were a lot more comfortable doing the mouse inoculation process. And the reason for that, and I hate to bring in yet another complicated area of science, but recombinant DNA technology was in its infancy. So I don't know that you really could use an amino acid sequence to go into a lab and just make a particular antibody. So at that time, actually, if you wanted to claim a particular antibody, what you would do is deposit that antibody, or it's called a hybridoma of an antibody. You would deposit a hybridoma in a depository. And then if another scientist or if another company wanted to make that antibody, they could sort of check it out and clone it. And that's how you would make that particular antibody. But if you wanted to kind of just go into a lab and make an antibody de novo, you really would have to inoculate a mouse and hope. But you don't have to do that anymore. Now we have a recipe. And because we have that recipe, I think the idea that you would tell scientists, well, just go and run that mouse process until you get what you're looking for, is really absurd. And I would also caution, again, this idea, which I think undergirds a lot of the arguments here on Petitioner's side, that we need to make new rules for new science. It's a dangerous idea. You think about consolidated Edison, where the first people who invented that light bulb with carbon filter paper, they really thought they had the best light bulb. They did. But they were wrong. They were simply wrong. And when we kind of make these predictions, you can stifle innovation. And I think this is another sort of response to the Lemley brief. What happens when you allow a genus patent that will cover not just something that has been invented, but also things that have not yet been made and used, is that nobody else has the incentive to go out and make and use them. So let's say you have this 15 binder, right? And if you look at Amgen's patent, and you look at the only thing you're going to be told to do is to go and inject a mouse, or there's another process which I do want to mention briefly, but you're going to go and inject a mouse and hope for the best, right? But if a scientist goes into a lab, and it takes all of the hard time and effort, and it goes through and it finds a 15 binder, that 15 binder belongs to Amgen. And that's just not the basic patent quid pro quo. Counsel, can I just ask you a question about the legal standard? You've emphasized full enablement. And that's certainly what Wood, for example, says from this court. But at least your colleagues both seem to suggest that there might be some elbow room, non-curate lex room in there somewhere, reasonableness. What do you think? What does the government think? I think there is always room for reasonableness. But I do think that the need to be reasonable needs to be tempered with the need not to accept sort of pronouncements about what is and is not different. Or what embodiments do and do not matter. So I think, again, the doctrine of equivalence is really, I think, where a lot of this reasonableness concern gets taken care of. I would also say that the Federal Circuit has, and I think quite correctly, said that if you claim a genus of wooden baseball bats, and every person skilled in the art knows that you can't make a baseball bat out of pine, then you don't have to say accept pine. Because the plain text of the statute says a person skilled in the art. So I think there you would have a little bit of reasonableness. And then a similar question with respect to cumulative efforts. There was some discussion about that, and maybe some agreement that cumulative effort may not be the right, it may be a consideration, but it's surely not a dispositive one. If the patent did clearly specify every single time you're going to produce a winner. And the problem here, as I understand, Respondent, is that that's no guarantee. Even if you do everything right and you follow all of it, conservative substitution, you're going to have some winners and you're going to have some losers. But if you could, for example, every single time get a winner, then the fact that it would require a long time to get them all wouldn't necessarily defeat a patent, would it? No. It certainly would not. I do agree with Respondent, it can be relevant. And I think it can particularly be relevant if, for example, you figure out that there's a million types of ammonia in the world. And 10 of them can be used instead of gasoline to run super efficient cars. But you don't know which 10. So you just claim the genus of ammonia that can be used to run cars. And then what you're saying is you have to go out there and try them. And you may actually have to try all a million of them to get to those 10. And so there, the cumulative effort is relevant because you're going to be there testing and testing and testing. So just a few minor factual points. First of all, I think that 400 number is misleading because, first of all, it's the 385 number. So that is how many they got when they ran this mouse process once. But this is not a product by process claim. They're not only claiming those 385. And they're not only claiming antibodies made by mice. They're claiming these antibodies that bind and block made through any process. And I also think that, at least looking at their expert testimony, I'm not sure that all of the competitor antibodies can be made with that mouse process. And I say that only because I look at trial transcripts 758. And if you look at that, their expert is talking about the various competitor antibodies. And it says you can run the mouse and we think you would get preluent by running the mouse experiments. But actually, you would need to get this phage library to make another of the competitor antibodies. To me, that looks like they're saying the mouse has some limitations. So you're going to need to use a different process. And I actually think you heard petitioner's counsel up here conceding that you're not necessarily going to make everything with the mouse because you're going to have some of these conservative substitution. You're going to make some antibodies with conservative substitution. And I think what he was saying is that that's an addition to those 400. So I do think, just as a factual point, we need to be careful and precise. And what I would urge the court is to look at the winter brief, but then also just focus on the legal question here. And I think answering that legal question just means reiterating the enablement inquiry that this court has been applying and applying and applying for 200 years. Counsel, is there anything that Mr. Clement said this morning with which the government disagrees? I did not hear anything. And on the doctrine of equivalence, wouldn't that be less protective of the investment someone might make to pursue these inventions in terms of its, I would say, maybe I'm not remembering right from earlier cases. But it seems to me that that would be less protective, and therefore less of an encouragement to investment. I mean, to the extent that petitioner is asking for protection for things that they have not enabled people to make and use, I think you're right, because I don't think the doctrine of equivalence is going to get them things they haven't invented yet. But I also think that that's just a basic patent quid pro quo. You don't get a patent on anything that you haven't enabled people to make and use. So I guess I would say yes, not being allowed to have their patent is going to get them less, but that's exactly what the law requires. Justice Thomas? Would you comment briefly on the relationship between the enablement inquiry and the invention, the claim? It seems as though, as Mr. Clement said, that the broader, the more you claim, the more you must focus on the enablement analysis. And I don't think you commented on that. I think that is often the case. You need to provide enough information to enable a person to make any given embodiment of your invention. And if you've claimed a lot of different things, you may have to put in a lot more information. I would say that sometimes I think it's going to be more, you're not going to have to give a ton more information. My understanding is that, for example, with respect to a chemical genus, you might be able to say, I'm talking about this family of chemicals that have this helical ring structure, and this chemical group that hangs off of it can be one of these five things. And that's actually going to enable a chemist, not me, to make tons and tons and tons of different things. So in this area, I think this, if I understand your argument and Mr. Clement's, this area doesn't seem to have the same predictive quality that you would find in some of the other areas. For example, his paint mixing would be relatively easy. But as you move along to the other antibodies in this area, it seems as though it's trial and error. It's more each one has to be assessed on its own terms. So it would seem to me that it would be more difficult to achieve what you just said in this particular area. I think that is exactly right, but I don't think that that means that you should bend the rules of enablement. And in fact, I think that could be very dangerous, right? Because one of the incentives right now for scientists to figure out the structure-function relationship in antibodies beyond the Nobel Prize, but another incentive is then you could claim broader genuses. If somebody is able to figure out, oh, well, when I identify this antigen, oh, I can figure out what amino acid sequences for every single different antibody that could bind to that antigen, then they would have a much better case for enablement. But if you say, no, it doesn't matter. You can claim all of those anyway, there's less incentive to find that sort of magic key, which I should not say magic. It's science. Justice Alito? Justice Son-Muir? Simple question, maybe not so simple. Mr. Clement, at one point in response to Justice Gorsuch, said you should dig this case. If we don't want to, what could we say to help the Federal Circuit or anyone else who's interested in this area? What could we say that they didn't say? What could we explain? Your petitioner's counsel has told us what he wants us to say. What would you want us to say? So I think, first of all, you could dig the case. We do not think that the Federal Circuit said anything wrong here. I think that some of the arguments that we're hearing from petitioners suggests that it might be useful to clarify that you really do need to enable each of the different embodiments that you're claiming, that you can't say these ones don't, quote, matter. Because that's simply not... First of all, it's hard to know what that means other than if you're invoking the doctrine of equivalence, with which petitioner said he can't invoke. But that requires sort of a predictive judgment that could really freeze innovation by saying, oh, don't worry, don't find that 15 binder, it doesn't matter. And, of course, what they're saying is it doesn't matter, but, by the way, if you do find it, and it does something truly amazing, we own it. Justice Kagan? Justice Gorsuch? I guess in response to what you said to Justice Sotomayor, it would be important for this court to say it essentially agrees with the Federal Circuit because there's been, as Justice Kagan points out, a lot of critiques of the Federal Circuit's approach, and if billions of dollars are on the line, this court saying as much along the lines that you proposed would eliminate that uncertainty about the legal standard, and then everyone would know it's up to Congress. I agree with that completely, and I think also with that final point, which is I think an important one that maybe hasn't been discussed here, that to the extent you did think that the petitioner had a good point that antibodies are just different and basic patent rules don't work, then the body that needs to make a special antibody exception is going to be Congress, not this court. I also completely agree that I do think it would be helpful to the extent there are scientists still out there making these broad genus claims that are going to stifle innovation. I do think that that's a danger to innovation, especially in the medical field where, from what people who know better than me tell me, antibody innovation is key, and we don't want people claiming more than they've really invented. Thank you. Justice Barrett? Justice Jackson? Thank you, counsel. Rebuttal, Mr. Lamkin? Thank you. A key fact for this case is that Sanofi has not identified one antibody that would require undue experimentation to make. Sanofi likes its chart. We like that chart as well because their whole purpose of that retrial was so that they could prove that those competitor antibodies aren't made using the roadmap, and the jury disagreed. There was no evidence of anybody ever saying, gee, I tried to make one of those competitor antibodies. It didn't come out the first time. I know the government points out that you might use a phase display for one, but the patents disclosures explain that you can use the mice and you can use phase displays, and this is how we would get them. And all this tells me that there's a reason out there why we have trials, why we have juries, and why we have patent examiners, so that we're not retrying all the elements of the case before this court. Before this court, the question is, did they prove that there's something you can't make or it's undue experimentation to make? And that evidence, that proof is simply absent. In terms of Winter, I think it's very interesting to get the functional equivalent of an expert report when you're in the Supreme Court. If the court's interested in the response to that, it's so closely parallel to Sanofi's brief in the Court of Appeals that I would recommend the court to look at our reply brief there, and it will have the answers to virtually everything that Mr. Winter has. And in fact, turning to the issue of millions, the question of millions matters only if you're looking at the cumulative effort to get to the millions. If each one is individually enabled, you know how to get there because you can do amino acid substitutions through this conservative substitution. You can get to any one you want. That's enablement. Each of those is enabled. The question of millions becomes not enablement only if you're going to look at the cumulative effort to make each and every one. And I think that is a fundamental point of disagreement. Is it even relevant how hard it is to make all of them as opposed to how hard is it for the skilled artisan to do what skilled artisans do, which is make one that they want? And in this sense, I would like to respond to Mr. Clement's point that somehow our roadmap makes it harder. No, the roadmap makes it much easier because if you know that it's going to bind the sweet spot, and we give you those two antibodies, those two antibodies that help you figure it out with high-throughput testing, quick and easy according to the testimony. If it binds there, it blocks. That's it. You're done. You have an antibody that works. With respect to Morse's eighth claim, yes, everybody forgets about Morse's seventh claim. And Morse's seventh claim was, in effect, you use electromagnetism to produce the motion of a machinery at distance to reproduce letters. We're just like Morse's seventh claim because we have a structure. You're using monoclonal antibodies, and we tell you how to produce them, and these are all monoclonal antibodies that have a characteristic that you can observe that they bind to a particular place, and by binding that place, they produce the function you want, blocking. There's a lot about criticizing functional claiming here, but in terms of functional claiming, that's not a 112A question of enablement. That's a 112B question, which describes what you have to do to claim. If people don't like functional claims, that's where it goes. And this claim really isn't functional in a relevant sense. The binding is a characteristic you can observe, like what the government called water observivity when it was talking about the Holland furniture case. It's something you can observe, and if you have that characteristic, you bind, and therefore you block, and you are exactly within the claim. As to the doctrine of equivalence, if you have an antibody that has a different amino acid sequence, that isn't protectable under the doctrine of equivalence because it's not equivalent. It has the same effect. It may also block. It doesn't make it equivalent. It's only equivalent if the limitations, the requirements are equivalent, and so you can swap out maybe one amino acid for one that's very similar, but if the amino acid in your claim structure is just missing, you just clipped it out, then you'd be around, and you would provide no protection whatsoever for people who are creating the antibodies. You invest $2.6 billion investing in and determining that there's a sweet spot, but if you bind to, you will block, and you will be saving lives, and the protection is limited to what? The 26 you described by amino acid sequence? That provides no protection at all because you can always come up with a 27, and that's the whole point of a roadmap. The roadmap is fully enabling because you can come up with that 27th, the 28th, or the 29th, whatever's out there, the testimony was, the roadmap will allow you to get to them all, and it's not an infinite test because the evidence in this trial, in this art, is there's just nobody who testified, said, gee, I ran the roadmap. I tried. I didn't get what I wanted. Something was missing. No evidence that Sanofi, on its first panel, didn't come up with its antibody product. No evidence that Amgen, on its first trial, failed to come up with its antibody, or any of the other competitors. When you run the roadmap, you get them. The 15 binder. If the 15 binder exists, it's going to come out, and it's going to be there. If I could turn just very quickly to the pop quiz issue of DIG. A minute. Thank you so much. This case, we should make no mistake, has incredible impacts. We have two decisions from the PTAB, both characterizing it as a cumulative effort to make all the embodiments test. Nobody can invest billions of dollars with this decision out there. Nobody can invest billions of dollars if it's even relevant. There's a legal dispute about the relevance of that cumulative effort test, and this court should address it and excise it from the law. Thank you. Thank you, counsel. The case is submitted.